## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**DEBORAH CUNNINGHAM,**                     Case No. 1:19 CV 2227

      Plaintiff,

      v.                                Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                        MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff Deborah Cunningham ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 13). For the reasons stated below, the Court affirms the decision of the Commissioner.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in June 2016, alleging a disability onset date of March 16, 2016. (Tr. 365-66, 372-77).[1] Her claims were denied initially and upon reconsideration. (Tr. 297, 304, 313, 320). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before an administrative law judge ("ALJ") on May 31, 2018. (Tr. 160-77). On August 9,

---

1. Plaintiff also filed an earlier application for benefits. *See* Tr. 238. In a decision dated March 18, 2016, the prior ALJ found Plaintiff had the residual functional capacity for a limited range of light work (Tr. 240), and could perform her past relevant work as a retail manager, or, alternatively, other retail jobs (Tr. 245-47). Therefore, the ALJ found Plaintiff not disabled through the date of his decision. (Tr. 248).

2018, the ALJ found Plaintiff not disabled in a written decision. (Tr. 146-55). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on September 26, 2019. (Doc. 1).

**FACTUAL BACKGROUND**

Personal Background & Testimony

Born in 1957, Plaintiff was 58 years old on her alleged onset date. *See* Tr. 365. She previously worked as a retail manager. (Tr. 170).

In a June 2016 function report, Plaintiff alleged disability due to sciatica in her right hip, an unaligned disc in her back with arthritis, a brain bleed, high cholesterol, and constant headaches. (Tr. 389). She stopped working as a retail store manager in October 2013 because she "could not handle the hours, standing was hurting [her] back, [and] management decided they did not need [her] anymore." (Tr. 390) (capitalization altered). In November 2016, Plaintiff stated her right knee cartilage was "deteriorating", her back pain had increased, she had right elbow problems, and she could not stand or walk "for long periods". (Tr. 413).

Plaintiff testified that her back and knee worsened since her prior ALJ hearing. (Tr. 166). Plaintiff appeared at the administrative hearing with a cane, which she used because her knee would "just give out on [her]" while walking. (Tr. 164-65); *see also* Tr. 166. She fell as a result of her knee giving out, but never required a trip to the emergency room. (Tr. 166). She underwent physical therapy. *Id.*

Plaintiff's back had worsened in that "[t]he pain level on a daily basis is a little more." (Tr. 167). She estimated she could sit for about an hour before having to get up or lie down, and stand for "[a]t most an hour". *Id.* The pain averaged six-and-a-half to seven out of ten daily, *id.*, but once

2

or twice per week was "off the charts" to the point Plaintiff could not do anything (Tr. 169). Plaintiff underwent physical therapy for her back, and took gabapentin and Tramadol. (Tr. 166-67). Plaintiff also underwent three injections at Urgent Care between her two hearings. (Tr. 168).

Relevant Medical Evidence

In October 2016, Plaintiff saw Antwon Morton, D.O., at the MetroHealth Physical Medicine and Rehabilitation ("PM&R") Clinic. (Tr. 457-60). Dr. Matthew Baltes, D.O., referred Plaintiff for an evaluation of right knee pain and lower back pain. (Tr. 458). Plaintiff reported persistent pain with intermittent shooting pain from her right buttock to her right lateral foot, with some numbness. *Id.* The numbness "ha[d] been there since breaking her foot years ago." *Id.* She could bend over to pick up objects on the ground "with occasional pain" and her pain was aggravated by picking up her 10-month-old grandson. *Id.* Plaintiff could sit for an hour "before getting up to walk around"; she could walk about one-half mile before stopping to rest and climbed "11 steps going into [the] basement" twice daily. *Id.* Plaintiff used a cane "intermittently because her balance is off occasionally after having a brain bleed"; she last fell was one month prior "after missing a step". *Id.* "[S]he trie[d] to do her [home exercise program] she learned in [physical therapy] daily or at least every other day." *Id.* Her right knee pain was four out of ten and her back pain was eight out of ten. *Id.* Plaintiff took pain medication "[w]ith minimal pain relief." *Id.* Dr. Morton noted Plaintiff was "[s]eeking [d]isability claim". (Tr. 460). On examination, Dr. Morgan noted Plaintiff had "mildly decreased" range of motion "in all planes" and tenderness at the lumbosacral junction and piriformis on the right. *Id.* She had no spasm or trigger points, and a straight leg raising test was negative bilaterally. *Id.* Plaintiff had pain with facet load testing bilaterally, but provocative testing was negative. *Id.* She had trunk flexion to 85 degrees with pain in the low back. *Id.* Plaintiff had tight muscles in her lumbar region, bilateral hips, quadriceps,

hamstring, and gastric soleus complexes, and tenderness to palpation over the medial joint line in her right knee, as well as pain with extension. *Id.* Her reflexes, sensation, motor strength, fine motor control, and gait were normal. *Id.* Dr. Morton's impression was right knee pain "related to [c]hrondromalacia [p]atella", chronic low back pain with intermittent right lower extremity radiation, and muscle tightness. *Id.* He instructed Plaintiff to continue her home exercise plan for progressive core strengthening, lumbar/lower extremity range of motion, and flexibility; she was also to continue Tramadol "as directed by PCP for pain", and prescribed a trial of Voltaren. *Id.* Plaintiff asked Dr. Morton about a disability placard and he instructed her to discuss this and "further medical [management]" with her primary care provider. *Id.*

In December 2016, Plaintiff saw Dr. Baltes at MetroHealth Beachwood Family Practice. (Tr. 455-56). Dr. Baltes noted Plaintiff's hyperlipidemia and sub-arachnoid bleed were stable and her insomnia unchanged, but she needed prescription refills. (Tr. 455). Dr. Baltes stated Plaintiff "ha[d] been cleared by neurosurgery and does not need any[] more follow[] up; she saw neurology for headaches and took Neurontin "which [was] helpful". *Id.* He also noted Plaintiff's lower back pain was "stable"; she denied "any radicular pain[,] numbness[,] or weakness", but needed a refill of Ultram. *Id.* Dr. Baltes's examination did not note any musculoskeletal findings; he assessed *inter alia*, chronic right-sided low back pain with right-sided sciatica and refilled Plaintiff's Voltaren prescription. (Tr. 456). He instructed Plaintiff to return in three to four months. *Id.*

In March 2017, at a visit for another issue, Plaintiff had a normal gait and no motor deficits. (Tr. 474). That same month, Plaintiff returned to Dr. Baltes. (Tr. 480-82).[2] Dr. Baltes made similar

---

2. At this visit, a staff person in the office, Doreen Mitchell, noted: "Patient has been identified as a falls risk due to one or more of the following steady gait [sic]." (Tr. 480). The note further indicated that "Patient/caregiver has been instructed: 1. To call for assistance for ambulation or transfer. 2. Keep wheelchair locked while in the exam room." *Id.* There is, however, no indication in the record that Plaintiff was ever in a wheelchair (nor does Plaintiff now so argue).

notes to Plaintiff's previous visit, including "stable" low back pain with no radicular pain, weakness, or numbness. (Tr. 480-81). On examination, Dr. Baltes noted Plaintiff had full motor strength and normal deep tendon reflexes. (Tr. 482). She further had full range of motion in her lumbar spine and a negative straight leg raising test; her lumbar spine was "non tender". *Id.* Dr. Baltes continued his diagnosis of chronic right-sided low back pain with right-sided sciatica; he refilled Plaintiff's Ultram/Tramadol and Voltaren prescriptions. *Id.*

Plaintiff again saw Dr. Baltes in July, at which point he continued to note Plaintiff's low back pain was stable and that she denied radicular pain, numbness, or weakness. (Tr. 492). The physical examination was the same as March. *Compare* Tr. 493 *with* Tr. 482. Dr. Baltes refilled medications and referred Plaintiff to PM&R and neurology at her request. (Tr. 494).

Plaintiff returned Dr. Morton in August. (Tr. 498-501).[3] She reported similar complaints as at her October 2016 visit. *Compare* Tr. 498 *with* Tr. 458. She had pain picking up her then-2-year-old grandson; she had not fallen since her prior visit and still used a cane "intermittently". (Tr. 498). She rated her pain as five out of ten. *Id.* Dr. Morton again noted Plaintiff was "[s]eeking [d]isabilty claim". (Tr. 500). Her physical examination was identical to that from October 2016. *Compare* Tr. 500-01 *with* Tr. 460. Dr. Morton offered an identical assessment to Plaintiff's previous visit, ordered a lumbar spine x-ray, and recommended physical therapy for core strengthening, lumbar/bilateral lower extremity flexibility/strengthening. (Tr. 501). He instructed Plaintiff to continue her home exercise program, continue medication as directed by her primary care physician for pain, and follow up with her primary care physician "for further medical management". *Id.* She was to return as needed or in three months. *Id.*

---

3. This record again contains an identically-worded falls risk note from Ms. Mitchell. *See* Tr. 501.

The lumbar spine x-ray revealed mild lumbar levoscoliosis, straightening of the lumbar lordosis with minor degenerative changes (small marginal osteophytes at several levels, and some narrowing and sclerosis of the facet joints bilaterally at L5-S1). (Tr. 504).

Plaintiff began physical therapy in September 2017 for lower back pain and lumbar radiculopathy. *See* Tr. 514.[4] She reported low back pain radiating to her right leg. (Tr. 515). She rated the pain as three to four out of ten; it was constant, but varied in intensity. (Tr. 516). The pain worsened with prolonged sitting, standing, or walking. *Id.* The therapist observed a "mild positive Trendelenburg gait" and Plaintiff was not using an assistive device. *Id.* Plaintiff had some limited trunk range of motion and limited right hip motion with pain, *id.*; she also had some reduced strength, and a positive straight leg raise test on the right (Tr. 517). Plaintiff had five more physical therapy visits in September and October. *See* Tr. 523-25, 529-31, 535-37, 541-43, 547-49. At her second visit, Plaintiff reported improvement in the ability to sleep at night. (Tr. 523). At the third, she denied radiating pain and was "[n]ot needing pain medication". (Tr. 529). The therapist noted Plaintiff was responding well to therapy. (Tr. 531, 537). At her final visit, Plaintiff "report[ed] she slipped on a step & jarred the whole RT side on Thursday". (Tr. 547). She was "ambulating with a cane" and had a moderate right antalgic gait. (Tr. 549). She was discharged, with the therapist noting she met four of her five therapy goals. *Id.*

An October 2017 right knee x-ray revealed mild degenerative changes and a MetroHealth Express Care physician diagnosed a sprain. (Tr. 554).

Plaintiff saw Dr. Baltes in January 2018. (Tr. 587-89).[5] Dr. Baltes noted Plaintiff was "[s]till having problems with lumbar pain"; it was "[m]ostly on the right side" and she denied

---

4. The referring provider for the initial physical therapy visit is listed as Dr. Baltes (*see* Tr. 514), however, all subsequent visits list Dr. Morton (*see* Tr. 523, 529, 535, 541, 547).
5. This record again contains an identically-worded falls risk note from Ms. Mitchell. *See* Tr. 587.

radicular pain, numbness, and weakness. (Tr. 587). On examination, Plaintiff had full range of motion, a negative straight leg raising test, full motor strength, and normal reflexes; however, her right SI joint was tender. (Tr. 588). Dr. Baltes referred Plaintiff back to PM&R, and instructed her to continue with anti-inflammatory medications and heat. (Tr. 589).

Plaintiff returned to Dr. Morton in February 2018. *See* Tr. 599-603. Plaintiff reported similar complaints as previously, including intermittent cane usage. (Tr. 599). In the history section, Dr. Morton noted: "standing 30 mins intervals" and "[s]itting 1-1.5 hrs intervals". *Id.* Plaintiff rated her pain at five to six out of ten; "bending at trunk and walking/standing for prolonged periods" aggravated her pain. *Id.* Dr. Morton again noted Plaintiff was "[s]eeking [d]isability claim". (Tr. 602). Dr. Morton further stated, in the physical examination section of his notes, "[t]here were no vitals taken for this visit." *Id.* The findings listed in the back examination and joint examination sections are almost identical to those from August 2017. *Compare* Tr. 602 *with* Tr. 501.[6] Dr. Morton offered a similar impression as previously, but eliminated his knee pain finding. *See id.* Under the "Plan" section, he noted he would fill out an FCE (functional capacity evaluation) form, and that Plaintiff should continue with her home exercise program and pain medications (as prescribed by her primary care physician). *Id.*

In March 2018, Plaintiff returned to Express Care for back pain. (Tr. 625-29). She was noted not to be a falls risk. (Tr. 625). Plaintiff described low back pain that radiated across her

---

6. The Commissioner correctly notes that the top of this record states: "Today's Visit: 8/7/17." *See* Tr. 599. However, the history section is slightly different than the August 2017 visit, *compare* Tr. 599 *with* Tr. 498, so this appears to be a typographical error. Further, the examination notes differ in that the August 2017 note states: "Pain with facet load testing bilateral. Prov[o]cative testing was negative" (Tr. 501). and the February 2018 note states: " Prov[o]cative testing: Pain with facet load testing bilateral" (Tr. 602). Thus, the Court rejects the Commissioner's argument that "[i]t is not clear that Dr. Morgan actually performed an exam in February 2018." (Doc. 15, at 4). The slight differences indicate these are two different records.

back and down her leg, as well as right knee pain related to a past sprain. (Tr. 626). She had no pain relief from Tramadol, heat, and cold; positional changes provided some relief. *Id.* On examination, Plaintiff had no midline tenderness or spasm in her back, but a positive straight leg raise test. (Tr. 627). She had a normal gait and "normal great toe and ankle dorsiflexion bilaterally with mild right lower extremity weakness"; her reflexes and sensation were intact. *Id.* Plaintiff was given a Toradol injection and instructed to follow up with PM&R. *Id.*

Later that month, Plaintiff saw Nurse Practitioner Tyecia Stevens, APRN-CNP, in the MetroHealth PM&R Clinic. (Tr. 613-17). Ms. Stevens noted Plaintiff "was recently seen by Dr. Morton last month". (Tr. 614). Plaintiff described chronic back pain with stabbing sciatica radiating down her right leg. *Id.* The Toradol injection from Express Care helped for about a week; physical therapy helped previously and Plaintiff wanted to try it again. *Id.* Ms. Stevens noted Plaintiff previously took "chronic Tramadol" but was not taking any medications at the time of the visit. *Id.* Plaintiff also reported right knee pain. *Id.* In the "Red Flags" and "Review of Systems" sections of her notes, Ms. Stevens noted Plaintiff was "negative" for gait/balance disturbance. (Tr. 614, 617). On examination, Ms. Stevens observed Plaintiff's lumbar lordotic curvature was normal, as was her range of motion; she had no scoliosis, spasm, or trigger points and her straight leg raising test was negative. (Tr. 617). She had tenderness to palpation at the lumbosacral spinal muscles on the right and piriformis muscles. *Id.* Her neurological examination was normal, with full motor strength and the ability to heel/toe walk and tandem gait "without difficulty." *Id.* Ms. Stevens noted Plaintiff had chronic lower back pain with radicular pain "most likely due to degenerative changes"; she ordered an MRI. *Id.* She instructed Plaintiff to request Tramadol from her physician and follow up with either Ms. Stevens or Dr. Morgan. (Tr. 618).

*Opinion Evidence*

In October 2016, State agency physician Steve McKee, M.D., reviewed Plaintiff's records and adopted the residual functional capacity from the March 2016 ALJ decision. (Tr. 258). Therein, the prior ALJ found Plaintiff could:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except [she] is limited to lifting and carrying up to 15 pounds occasionally and 10 pounds frequently; [she] is limited to standing and walking for six hours and sitting for six hours in an eight-hour day; constantly push, pull, and foot pedal; occasionally climb ramps/stairs; never climb ladders, ropes, and scaffolds; constantly balance; occasionally stoop and crouch; and never kneel or crawl. [She] should avoid dangerous machinery and unprotected heights.

(Tr. 241); *see also* Tr. 256.

In February 2017, State agency physician Diane Manos, M.D., reviewed Plaintiff's records and found she had the residual functional capacity to occasionally lift and carry twenty pounds, frequently lift and carry ten pounds, and stand/walk or sit for about six hours each in an eight-hour workday. (Tr. 287). Plaintiff could occasionally climb ramps/stairs, stoop, kneel, crouch, or crawl, frequently balance, and never climb ladders, ropes, or scaffolds. *Id.* Dr. Manos further opined Plaintiff should avoid exposure to unprotected heights and hazardous machinery. (Tr. 288).

In February 2018, Dr. Morton completed a medical source statement wherein he opined Plaintiff's ability to lift or carry was not affected by her impairment. (Tr. 609). He stated Plaintiff could stand or walk for two to four hours in an eight-hour workday, thirty minutes without interruption. *Id.* She could sit for four hours, one to one-and-a-half hours without interruption. *Id.* Plaintiff had postural restrictions to occasional climbing, balancing, stooping, crouching, or kneeling, and could rarely crawl. *Id.* As the medical findings in support of these restrictions, Dr. Morton cited Plaintiff's August 2017 lumbar spine x-ray, which he stated showed: "mild levoscoliosis and straightening with minor degenerative changes." *Id.* Dr. Morton opined Plaintiff

9

could frequently reach and perform fine and gross manipulation, but only occasionally pull. (Tr. 610). As the medical findings in support, he wrote "NA". *Id.* He further stated Plaintiff should avoid heights, moving machinery, and temperature extremes, noting: "worsens back and right leg radicular symptoms". *Id.* Dr. Morton indicated Plaintiff was prescribed a cane; she needed to be able to alternate positions between sitting, standing, and walking at will and elevate her legs to 45 degrees at will. *Id.* Plaintiff further experienced moderate to severe pain that Dr. Morton opined would interfere with concentration, take Plaintiff off-task, and cause absenteeism. *Id.* Plaintiff would also require four hours of additional rest periods during an eight-hour workday. *Id.*

In March 2018, Dr. Baltes completed a mental capacity medical source statement wherein he opined Plaintiff had no mental restrictions other than a "moderate" impairment in the ability to work a full day without needing additional rest periods. (Tr. 611-12).

In May 2018, Ms. Stevens completed a medical source statement in which she checked a box indicating Plaintiff's ability to lift/carry was not affected, but then noted Plaintiff could occasionally lift ten pounds, citing Plaintiff's x-ray findings of mild scoliosis and minor degenerative changes and that she had "[d]ifficulty carrying 2 gallons". (Tr. 639). She opined Plaintiff could stand or walk for 20 to 30 minutes without interruption, for a total of less than one hour of an eight-hour workday, citing Plaintiff's "30+ year [history] of chronic back pain". *Id.* She further concluded Plaintiff could sit for one hour without interruption, and a total of one hour in an eight-hour workday "with breaks", again citing Plaintiff's lumbar degenerative changes. *Id.* She opined Plaintiff could rarely perform most postural activities (climbing, stooping, crouching, kneeling, and crawling), but could occasionally balance. *Id.* As the findings in support, Ms. Stevens wrote "physical assessment" and noted Plaintiff had "difficulty squatting as well". *Id.* She stated Plaintiff could occasionally push/pull, but frequently reach, and perform fine or gross

manipulation, citing "[d]egenerative changes" in Plaintiff's lumbar spine. (Tr. 640). She stated Plaintiff should avoid moving machinery, temperature extremes, and pulmonary irritants, but left blank the section requesting medical findings in support. *Id.* She indicated Plaintiff was prescribed a cane, needed to be able to change position from sitting, standing, and walking at will, but did not need to elevate her legs. *Id.* Ms. Stevens noted Plaintiff experienced moderate pain that would interfere with concentration, cause Plaintiff to be off task, and cause absenteeism; Plaintiff would require two to three fifteen to twenty-minute unscheduled breaks in an eight-hour workday. *Id.* Ms. Stevens signed the form where it called for a "Physician's Signature" and wrote "Tyecia Stevens"[7] where it asked for a printed physician's name. *Id.*

VE Testimony

A VE testified at the hearing before the ALJ. (Tr. 170-75). The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, work experience, and residual functional capacity ("RFC") as ultimately determined by the ALJ. *See* Tr. 171. The VE responded that such an individual could perform Plaintiff's past work as a retail manager as generally performed. *Id.* The VE also testified Plaintiff could perform other jobs such as assistant sales manager, salesperson, or cashier/checker. (Tr. 172). The VE further testified that a sit/stand option or the need to elevate one's legs at will would preclude both Plaintiff's past work and the other jobs identified. (Tr. 174-75).

ALJ Decision

In his August 9, 2018 decision, the ALJ found Plaintiff met the insured status requirements for DIB through December 31, 2018 and had not engaged in substantial gainful activity since her

7. Ms. Stevens's signature is somewhat difficult to read. The ALJ referred to her as "Anita Stephens" (Tr. 165) and "Nita Stephens" (Tr. 176) at the hearing, and "Neda Stevens" in the decision (Tr. 152).

alleged onset date of March 16, 2016. (Tr. 149). He found Plaintiff had severe impairments of: status post subarachnoid hemorrhage, mild degenerative changes of the spine, and chrondomalacia patellae of the right knee; however, none of these impairments – singly or in combination – met or medically equaled the severity of a listed impairment. *Id.* The ALJ then concluded Plaintiff had the RFC: "to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except for no climbing of ladders, ropes or scaffolds; occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling; and no exposure to hazards (heights, machinery, or commercial driving)[.]" (Tr. 150). Based on this RFC, the ALJ found Plaintiff could perform her past relevant work as a retail manager. (Tr. 153). He alternatively found Plaintiff was capable of performing other jobs existing in significant numbers in the national economy such as a salesperson, assistant sales manager, and cashier/checker. *Id.* Therefore, the ALJ concluded Plaintiff was not disabled from her onset date through the date of the decision. *Id.*

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

**STANDARD FOR DISABILITY**

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and

meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff first argues the ALJ failed to properly evaluate the opinion evidence from Dr. Morton and Ms. Stevens. Specifically, she contends the ALJ failed to follow the treating physician rule as to Dr. Morton's opinion, and that his reasons for discounting both opinions are not supported. Second, she asserts the ALJ erred in failing to evaluate whether her need to use a cane impacted her ability to perform the exertional requirements of light work. For the reasons discussed below, the Court finds no error and affirms.

Opinion Evidence

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188.[8] A treating physician's opinion is given "controlling weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give

---

8. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819. Plaintiff filed her claim in 2016 and thus the previous regulations apply.

14

"good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (quoting SSR 96-2p, 1996 WL 374188, at *4). When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin*., 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

An ALJ's brief explanation may satisfy the "good reasons" requirement, if that brief analysis touches on the required factors. *See Allen v. Comm'r of Soc. Sec*., 561 F.3d 646, 651 (6th Cir. 2009). However, a conclusory statement that a treating physician's opinion is inconsistent with the record is insufficient to satisfy the rule. *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010).

Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. §§ 404.1502, 416.902. "[A]cceptable medical source[s]" include "licensed physicians" and "licensed or certified psychologists." 20 C.F.R. §§ 404.1513(a)(1)–(2), 416.913(a)(1)-(2). Evidence from

those who are "not acceptable medical sources" or "other sources", is "important and should be evaluated with key issues such as impairment severity and functional effects, along with other relevant evidence in the file." SSR 06-3p, 2006 WL 2329939, at *2. The ALJ "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at *6. Interpreting SSR 06-3p, the Sixth Circuit explained that "[o]pinions from non-medical sources who have seen the [Plaintiff] in their professional capacity should be evaluated by using the applicable factors, including how long the source has known the individual, how consistent the opinion in with other evidence, and how well the source explains the opinion." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). A nurse practitioner is such an "other source". *Id.*

With this background, the Court turns to Plaintiff's challenge to the ALJ's analysis of the opinion evidence. After summarizing the majority of the medical records – including two of Plaintiff's three visits to Dr. Morton and her single visit with Ms. Stevens (Tr. 151-52) – the ALJ addressed Dr. Morton's and Ms. Stevens's opinions together:

> No weight is given to the medical opinions of Dr. Antwon Morton (See 7F) or Neda [sic] Stevens (See 10F). Ms. Stevens did not identify herself as a physician or any type of medical professional. Additionally, these forms were checklist-type assessments that offered no objective evidence of their findings, except Dr. Morton citing mild degenerative changes (7F/1). Lastly, their opinions are inconsistent with the record. For example, Dr. Morton notes the claimant would need an additional 4 hours of rest period a day, despite exam findings being consistently remarkable[9] with normal gait and normal strength in all extremities. For these reasons, no weight is given to these opinions.

---

9. This appears to be a typographical error. In context, it seems the ALJ likely intended the word "unremarkable" rather than "remarkable." *See* Tr. 152.

(Tr. 152).

Preliminarily, the parties disagree about whether Dr. Morton was a "treating physician" thus requiring the ALJ to provide "good reasons" for the weight assigned to his opinion. Plaintiff contends that the ALJ "did not specifically recognize Dr. Morton's treating physician standing, despite substantial evidence that a treating relationship existed." (Doc. 12, at 10). She further contends that Dr. Morton should have been recognized as a treating physician "given his examinations and treatment of the Plaintiff and his participation in the team-approach of medical care provided at MetroHealth." *Id.* at 11 (citing *Pater v. Comm'r of Soc. Sec.*, 2016 WL 3477220 (N.D. Ohio)). The Commissioner responds that Dr. Morgan did not qualify as a treating physician, arguing that three examinations is insufficient to confer treating physician status. (Doc. 15, at 6) (citing *Mireles ex rel. S.M.M. v. Comm'r of Soc. Sec.*, 605 F. App'x 397, 398 (6th Cir. 2015). Further, the Commissioner contends, even if Dr. Morgan were a treating physician, the ALJ's decision provides the required "good reasons" to reject his opinion.

The ALJ did not make a finding as to whether Dr. Morton was a treating physician. However, it is unnecessary to resolve this dispute as the Court agrees with the Commissioner that the ALJ's rationale satisfies the regulatory "good reasons" requirement. The ALJ gave two reasons to discount Dr. Morton's opinion: (1) the form was a "checklist-type assessment that offered no objective evidence of [its] findings, except . . . citing mild degenerative changes"; (2) the opinion was "inconsistent with the record . . . [including] exam findings being consistently remarkable [sic] with normal gait and normal strength in all extremities". (Tr. 152).

The Sixth Circuit has found it appropriate to question the reliability of checkbox forms unaccompanied by explanation or accompanied by minimal explanation. *See Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x 563, 566-67 (6th Cir. 2016) (ALJ did not err in discounting examiner's

17

opinion that contained checkbox forms); *see also* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) ("Supportability. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion."). In *Ellars*, the Sixth Circuit noted that the physician at issue "simply noted plaintiff's impairments consisted of severe peripheral vascular disease, coronary artery disease, COPD, depression and anxiety"; it found "[t]hese remarks were not sufficient to explain [the physician's] findings." 647 F. App'x at 567. Dr. Morton's checkbox opinion form included, as the ALJ recognized, a citation to Plaintiff's August 2017 lumbar spine x-ray showing mild findings. *See* Tr. 609. On the second page – and not cited by the ALJ – Dr. Morton also cited heights, moving machinery and temperature extremes as environmental limitations, stating: "worsens back and right leg radicular symptoms". (Tr. 610). As in *Ellars*, the Court finds the ALJ's rationale for discounting the opinion (despite Dr. Morton's brief explanations) is a legitimate, supported reason to discount the opinion. That is, his citation to mild findings on a lumbar x-ray is "not sufficient to explain", 647 F. App'x at 567, his extreme restrictions such as only being able to stand or walk for two to four hours in a day (30 minutes at a time) and sit for four hours (one to one-and-half without interruption), elevate her legs at will and change positions at will, and require an additional four hours of unscheduled rest time during an eight-hour workday. *See* Tr. 609-10. The ALJ's explanation – critiquing the level of explanation provided within the opinion – implicated the regulatory factor of "supportability". *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3); *cf. Golden v. Berryhill*, 2018 WL 7079506, at *14 (N.D. Ohio) ("Contrary to Golden's argument, the ALJ was not rejecting Dr. Balaji's opinion because there was no objective evidence to support it, but because the doctor himself provided no support for his conclusions."), *report and recommendation adopted*, 2019 WL 415250. Plaintiff further argues (in addressing Ms. Stevens's opinion), that rejecting an opinion "for no other reason than disliking the

format in which [it is] presented" is legal error. (Doc. 12, at 15). But this was not the only reason the ALJ provided.

Second, the ALJ stated that the opinion was "inconsistent with the record". (Tr. 152). By way of example, he cited Dr. Morton's opinion that Plaintiff would need an additional four hours of unscheduled rest time in an eight-hour work day as inconsistent with "exam findings being consistently remarkable [sic] with normal gait and normal strength in all extremities." *Id.* Although it is insufficient for an ALJ to "dismiss a treating physician's opinion as 'incompatible' with other evidence of record" without explanation, *Friend*, 375 F. App'x at 552, the Sixth Circuit has also explained that remand is not required when "it is clear which evidence [the ALJ] was referring to" as inconsistent. *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474 (6th Cir. 2016). Here, on the previous two pages, the ALJ summarized the medical evidence of record, repeatedly noting normal findings such as normal gait and strength. *See* Tr. 151-52 (citing Tr. 474 (normal gait, no motor deficits), Tr. 482 (normal motor strength); Tr. 571 ("[g]ait & tandem ok"); Tr. 577 (normal motor strength); Tr. 602 (normal motor strength and gait); Tr. 614 (negative for gait/balance disturbance) or extremity weakness)). It was thus reasonable for the ALJ to consider such repeated normal findings as inconsistent with the more extreme restrictions in Dr. Morton's opinion. *See Hernandez*, 644 F. App'x at 474; *see also Murphy v. Comm'r of Soc. Sec.*, 2019 WL 6463392, at *1 (N.D. Ohio) (finding an ALJ's decision to discount an opinion as not "consistent with the medical evidence of record, which supports generally mild findings" sufficient where it was "clear from [his earlier] discussion which mild findings the ALJ was referring to").

Taken together, the Court find that the ALJ's explanation, although brief, provided substantially supported "good reasons" – addressing the regulatory factors of consistency and supportability – for rejecting Dr. Morton's opinion. These reasons are "sufficiently specific to

make clear to [this] reviewer[] the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *4. Plaintiff correctly points to other findings in the record that could support a greater degree of limitation. *See* Doc. 12, at 11-12 (citing Tr. 457-60, 498-504, 602 (Dr. Morton's findings of intermittent pain, mildly decreased range of motion, tenderness, tight muscles, and pain with facet loading)). But the ALJ did not ignore these findings, in fact he cited them in his decision. *See* Tr. 151-52. And this Court must affirm "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. The findings Plaintiff cites are not so substantial that the Court can say the ALJ's reliance – to the contrary – on findings of normal gait and muscle strength – are not a good reason to discount Dr. Morton's restrictive opinion. It is for the ALJ, not this Court, to weigh the evidence in the first instance. *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) ("This court reviews the entire administrative record, but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ.").

As to Ms. Stevens's opinion, the Court finds the same rationale applies. First, as a nurse practitioner, her opinion was not entitled to the same deference as Dr. Morgan's, nor was the ALJ required to provide "good reasons" for rejecting it. *See Handzel v. Comm'r of Soc. Sec.*, 2014 WL 2611858, at *4-5 (N.D. Ohio) (ALJs are not required to give "good reasons" for rejecting the opinions of nurse practitioners because they are not acceptable medical sources under the regulations); *Leach v. Comm'r of Soc. Sec.*, 2015 WL 1221925, at *3 (N.D. Ohio) ("[T]he regulations do not require the same heightened 'good reasons' analysis that applies to the opinions of acceptable medical sources.").. Rather, he was to "explain the weight given" to the opinion "or otherwise ensure that the discussion of the evidence in the determination or decision allows a

claimant or subsequent reviewer to follow the [ALJ's] reasoning". SSR 06-3p, 2006 WL 2329939, at *6; *see also Cruse*, 502 F.3d at 541. Ms. Stevens's opinion was similarly a checkbox-style opinion that offered even more restrictive limitations. *See* Tr. 639-40 (standing/walking for less than one hour in an eight-hour workday, for no more than 20 to 30 minutes at a time, sitting for a total of one hour per day with breaks"). And, similar to Dr. Morton, Ms. Stevens cited Plaintiff's x-ray results showing mild scoliosis and minor degenerative changes. *See id.* She also provided slightly more explanation – citing Plaintiff's "30+ year [history] of chronic back pain" in support of her standing/walking restrictions, and a "physical assessment" in support of her postural restrictions. (Tr. 639). But again, for this "other source" opinion, the ALJ was simply required to explain the weight assigned. He did so sufficiently, touching on the same factors of consistency and supportability as he did with Dr. Morton's opinion. This reviewing Court can follow the ALJ's line of reasoning for discounting Ms. Stevens extremely limiting opinion. No more was required. *See* SSR 06-3p, 2006 WL 2329939.

This is not to say that the ALJ's analysis of the opinion in this case should be lauded as a model of Social Security analysis. He certainly could have been more specific, and more thorough in his evaluation of the opinion evidence. The Court is somewhat troubled by the ALJ's seeming failure to recognize the names of medical providers whose names appear in the treatment record, despite summarizing those very treatment records. *Compare* Tr. 152 ("Ms. Stevens did not identify herself as a physician or any type of medical professional.") *and* Tr. 165 ("Anita Stephens [sic] is a nurse, isn't she? . . . "Counsel, I know that Ms. Stephens is - - well, quite . . . exaggerated in her opinions. I don't normally give her weight. But, I do know, she doesn't even provide her qualifications. So, in light of the fact that she hasn't even provided what qualifications she has, I'm rejecting her opinion under B10F, okay?") *and* Tr. 176 ("For future reference counsel, if you're

21

going to submit anything by anyone, have them provide their qualifications on the file. Just - - I don't know who Nita Stephens [sic] . . . is. For all I know, she could be the cleaning lady in the hospital. I mean, it doesn't help me, okay?"), *with* Tr. 613-17 (Plaintiff's examination with Ms. Stevens, which the ALJ summarized on Tr. 152); *compare also* Tr. 152 ("[N]o weight is given to the opinion of Matthew Baltes . . . He also did not identify himself as a medical professional."), *with* Tr. 455-46, 480-82, 492-94, 587-89 (treatment records from Dr. Baltes, all of which except the last the ALJ summarized and cited on Tr. 151). The Commissioner notes that the ALJ has no duty to "comb through the record to infer names" and that Ms. Stevens's handwriting was not entirely legible, perhaps making it unclear to the ALJ that she was the same Ms. Stevens as appeared in the treatment record. (Doc. 15, at 10). Fair enough. *See* Tr. 640. And Plaintiff does not challenge the ALJ's evaluation of Dr. Baltes's opinion. Further, as discussed above, the ALJ's rationale regarding Dr. Morton's opinion – regardless of the ALJ's failure to identify him as a treating physician – satisfies the "good reasons" rule. As such, any error in this regard is not a reversible one.

Thus, mindful that "judicial review does not contemplate a quest for administrative perfection," *Hill v. Astrue*, 2013 WL 3293657, at *4 (W.D. Ky.) (citing *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989)), the Court finds that the ALJ's evaluation of the opinion evidence in this case complied with the relevant regulations, and is supported by substantial evidence.

<u>SSR 96-9p & Cane Usage</u>

Plaintiff next contends the ALJ erred by failing to take into account Plaintiff's "use of, and *need* for a cane" in the RFC. (Doc. 12, at 18) (emphasis in original). She contends that her need to "periodically" use a cane is inconsistent with the sustained performance of light work. *Id.* at 16.

According to the Sixth Circuit, if a "cane [is] not a necessary device for claimant's use, it cannot be considered an exertional limitation that reduced her ability to work." *Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002). For an ALJ to find a hand-held assistive device is "medically required", "there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." SSR 96-9p, 1996 WL 374185, at *7. Although the Sixth Circuit has not directly ruled on this issue, other circuit courts have noted the key finding in cases involving assistive devices is documentation "describing the circumstances for which [the assistive device] is needed", *id. See Tripp v. Astrue*, 489 F. App'x 951, 955 (7th Cir. 2012) (noting that a finding of medical necessity of an assistive device requires a statement of the circumstances in which it is needed and that other circuits "have required an unambiguous opinion from a physician stating the circumstances in which an assistive device is medically necessary"); *Spaulding v. Astrue*, 379 F. App'x 776, 780 (10th Cir. 2010) (prescription for a cane from the Veteran's Administration insufficient to show medical necessity); *Howze v. Barnhart*, 53 F. App'x 218, 222 (3d Cir. 2002) (prescription and references that claimant used a cane insufficient to show medical necessity).

District courts within the Sixth Circuit have found that lacking such a statement, an ALJ is not required to incorporate the use of an assistive device in the RFC. *See Krieger v. Comm'r of Soc. Sec.*, 2019 WL 1146356, at *6 (S.D. Ohio) (finding ALJ did not err in not including a limitation for a cane where physician indicated claimant would need a cane but did not describe the specific circumstances for which a cane is needed as required by SSR 96-9p), *report and recommendation adopted*, 2019 WL 3955407; *Golden*, 2018 WL 7079506, at *19 ("Moreover, as

[the doctor's] confirmation of a cane prescription does not indicate 'the circumstances for which [the cane] is needed,' it does not fulfil the requirements under SSR 96-9p."); *Salem v. Colvin*, 2015 WL 12732456, at *4 (E.D. Mich.) (finding the ALJ did not err in not including a limitation for a cane, when it had been prescribed, but the prescription did not "indicate the circumstances in which [the claimant] might require the use of a cane"); *Halama v. Comm'r of Soc. Sec.*, 2013 WL 4784966, at *8 (N.D. Ohio) ("[E]ven Halama does not contend that the record contains the unambiguous statement of a physician containing the circumstances under which it would be medically necessary for him to use a cane. Inasmuch as there is no such statement in the record, I find that the decision of the ALJ in this case not to incorporate the use of a cane into the RFC is supported by substantial evidence.") (internal quotation omitted).

Evidence in the record of Plaintiff's cane usage includes: (1) Plaintiff's testimony and appearance with a cane at the hearing (Tr. 164-65); (2) Dr. Morton's notes that Plaintiff used a cane "intermittently" (Tr. 458, 498, 599); (3) the (somewhat ambiguous) "falls risk" notes (Tr. 480, 501, 587); (4) Plaintiff's use of a cane at physical therapy on one occasion (after a fall) (Tr. 547-48); and (5) Dr. Morton's & Ms. Stevens's opinions in which they each checked a box indicating a cane had been prescribed (Tr. 610, 640). None of this evidence – individually or collectively – meets the standard set forth in SSR 96-9p. That is, Plaintiff did not present "medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." SSR 96-9p, 1996 WL 374185, at *7. As such, the ALJ did not err in failing to discuss or include a cane in the RFC.

24

**CONCLUSION**

Following review of the arguments presented, the record, and the applicable law, the Court finds the Commissioner's decision denying DIB and SSI supported by substantial evidence and affirms that decision.

 s/ James R. Knepp II
United States Magistrate Judge